**\*FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

The Honorable Freda L. Wolfson, U.S.D.J.

|  |  |
|---|---|
| TRENDX ENTERPRISES, INC. : | Civil Action No. 11-2512 |
| : | |
| Plaintiff, : | |
| : | **OPINION** |
| vs. : | |
| : | |
| ALL-LUMINUM PRODUCTS, INC. | |
| d/b/a RIO BRANDS : | |
| : | |
| Defendant. : | |

For Plaintiff:
Gregory S. Chiarello
Vladeck, Waldman, Elias, & Engelhard, P.C.
1501 Broadway, Suite 800
New York, NY 10036

For Defendant:
Thomas A. Cunniff
Fox Rothschild LLP
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648-2311

**WOLFSON, United States District Judge:**

Presently before the Court is a motion by Defendant All-luminum Products, Inc., doing business as Rio Brands ("Defendant" or "Rio Brands"), for partial judgment on the pleadings under Rule 12(c), or alternatively, for partial summary judgment. Defendant asks the Court to dismiss Plaintiff Trendx Enterprises, Inc.'s ("Plaintiff" or "Trendx") patent infringement claim (Count I) because Plaintiff failed to join the patent owner of the patents-in-suit and Plaintiff by itself lacks sufficient interest in the patents to bring this action on its own. Defendant does not attack any of Plaintiff's seven other causes of action. For the reasons that follow, Defendant's motion is granted and Plaintiff's claim of patent infringement is dismissed without prejudice.

**I.      BACKGROUND**

In addressing Defendant's Motion to Dismiss, this Court must accept Plaintiff's allegations contained in the Complaint as true. See Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 457 (3d Cir. 2003); Dayhoff, Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir. 1996). Thus, the facts recited below taken from the Complaint do not represent this Court's factual findings.

Plaintiff alleges that Defendant infringes the following four patents: U.S. Patent No. 5,120,016 (the '016 patent); No. 5,575,234 (the '234 patent); No. 5,813,163, (the '163 patent); and No. 5,941,191 (the '191 patent) (collectively the "patents-in-suit" or "T-Bar patents"). The patents relate to technology that secures poles, umbrellas, rods, or similar objects to a structure, such as a deck or dock, without screws, nails, glue, or other means that may damage the deck or dock surface. Compl., ¶ 10. Plaintiff Trendx manufactures and markets products that utilize the T-Bar patents under the name "Deckster." Id. ¶¶ 9, 11. In particular, Trendx manufactures and sells devices "designed

to be a receptacle for various items (i.e. Tiki torches, flag poles, market umbrellas, etc.) so they could be securely held to a deck or dock." Id. ¶ 11. Trendx alleges that Rio Brands has marketed and continues to market infringing devices also under the "Deckster" name. Id. ¶ 34.

The question before me is whether Trendx has standing to bring a claim for infringement. Trendx admits it does not own the patents at issue. Dysar Products, Inc. and Edward Dysarz (collectively "Dysarz") own the patents.[1] Compl., ¶ 7. But Trendx maintains it is the exclusive licensee of the T-Bar patents and controls all substantial rights in the patents. Id. ¶ 6.

Dysarz has a history with both Trendx and Rio Brands. Dysarz first licensed the T-Bar patents to Trendx through two agreements, one in 1999 and one in 2000, which gave Trendx the exclusive right to manufacture, market, or sell products containing the patented technology, excluding all marine products. Compl., ¶ 8. Dysarz retained the right to its technology as applied to marine products, such as fishing rod holders. Id. Trendx paid Dysarz royalties in exchange for its license. Id. Shortly after signing its license with Dysarz, Trendx entered into a sublicense agreement with Rio Brands. Id. ¶¶ 15, 16. Then in September 2005, Dysarz terminated its agreement with Trendx. Id. ¶ 21. Because this ended Trendx's right to sublicense, Rio Brand no longer had rights to the patented technology. Id. Less than a year later, in August 2006, Dysarz and Trendx renegotiated a licensing agreement, again limited only to nonmarine products. Id. ¶ 23.

---

[1] Trendx alleges that Dysar Products, Inc., owns the patents. Compl., ¶ 7. Rio Brands claims that the Patent and Trademark Office records show that Edward Dysarz owns the patents. Def. Motion, n.2. Whether Dysar Products, Inc., Edward Dysarz, or both own the patents is of no consequence here; it is only material that Trendx admits it does not own the patents-in-suit.

3

Although Trendx notified Rio Brands that it had reacquired rights to the patents, they did not enter into a new sublicense. Id. ¶ 24.

In September 2006, Dysarz contacted Rio Brands to discuss past royalties from September 2005 through August 2006. Compl., ¶ 28. These conversations continued without success and in July 2008, Rio Brands brought a declaratory judgment action against Dysarz in the Eastern District of Pennsylvania to declare that its products did not infringe the '016 patent, the '234 patent, and the '163 patent. All-luminum Products, Inc. v. Dysarz, No. 08-3462, Complaint (E.D. Pa. July 24, 2008). Dysarz then filed a patent infringement action in the Eastern District of Texas on the same three patents. Dysarz v. All-luminum Products, Inc., No. 08-402, Complaint (E.D. Tex. Oct. 20, 2008). In December 2009, Dysarz and Rio Brands settled with regards to the '016 patent, the '234 patent, and the '163 patent ("Settled Patents"). Compl., ¶ 30. Dysarz released its claims against Rio Brands and granted Rio Brands an exclusive license in the '016 patent and a covenant not to sue with regards to the '234 and the '163 patents. License and Settlement Agreement, Articles II and III, attached as Ex. G to Declaration of Thomas Cunniff ("Settlement Agmt"). The '191 patent was not at issue in those matters. Trendx was not a party to either lawsuit or to the settlement. Compl., ¶¶ 29, 30. Trendx claims that this settlement has no effect on its patent rights as exclusive licensee of nonmarine products incorporating the T-Bar patented technology.

Two issues arise from these facts: (1) does Trendx's status as licensee give it standing to sue on these patents and (2) what effect, if any, does the settlement between Dysarz and Rio Brands have on this action.

## II. LEGAL STANDARD

### a. Motion for Judgment on the Pleadings

4

The standard that a court applies on a motion for judgment on the pleadings pursuant to Rule 12(c) is the same standard that a court applies in deciding a motion to dismiss pursuant to Rule 12(b)(6). Turbe v. Government of Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991); see also Spruill v. Gillis, 372 F.3d 218, 223 n.2 (3d Cir. 2004). When reviewing a motion to dismiss, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal citations and quotations omitted). In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 561 (quoting Conley, 355 U.S. at 45-46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 555. As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 556).

In affirming that Twombly standards apply to all motions to dismiss, the Supreme Court recently explained the following principles. "First, the tenet that a court

5

must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009); Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft, 129 S. Ct. at 1950. The plausibility standard requires that "the plaintiff plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." Id. at 1949 (quoting Twombly, 550 U.S. at 556). Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Fowler, 578 F.3d at 211. In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Importantly, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." Id. Accordingly, the Court has reviewed the documents that form the basis of Plaintiffs' Complaint and that were attached to the Declaration of Thomas Cunniff in support of Rio Brand's Motion for Judgment on the Pleadings.[2] Because I can decide Defendant's motion based on the

---

[2] Plaintiff argues that any materials beyond its license agreement with Dysarz, including the settlement agreement between Dysarz and Rio Brands, is outside the pleadings and therefore is beyond what I may rely on in deciding Defendant's motion for judgment on the pleadings. Pl. Opp., at 20. Alternatively, Plaintiff argues that if I treat Defendant's

pleadings and the license agreement between Dysarz and Trendx, which both parties agree is appropriate to consider, I need not convert Defendant's motion for partial judgment on the pleadings into a motion for partial summary judgment.

### III.   DISCUSSION

#### a.  Trendx's Standing to Sue

My threshold inquiry is whether Trendx may bring its infringement action based on patents owned by someone else.  Trendx argues it has all essential rights to the patents-in-suit; Rio Brands argues that Trendx lacks sufficient standing and must join Dysarz.

The Patent Act allows a "patentee" civil remedies for patent infringement.  35 U.S.C. § 281.  The Act defines "patentee" to include not only the person to whom the patent has issued, but successors in title to the patentee and their assignees.  35 U.S.C. § 100(d).  Therefore, a suit for infringement must ordinarily be brought by a party holding "legal title" to the patent.  See Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1579 (Fed. Cir. 1991).  Were Trendx an assignee of Dysarz's patent rights, then there is no question it would have standing to bring suit on its own.  See Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 875 (Fed. Cir. 1991).  But where, as here, the suing party is a licensee – even a purported exclusive licensee – then the question becomes whether Trendx can be considered a "virtual assignee."  See Enzo Apa

---

motion as one for summary judgment, then I should afford Plaintiff an opportunity to conduct discovery.  Plaintiff does not dispute that Exhibit G attached to Mr. Cunniff's declaration is the true and correct copy of Dysarz's settlement and license agreement with Rio Brands, and both Plaintiff's Complaint and Plaintiff's Opposition discuss the interactions between Dysarz and Rio Brands, including their settlement, at length. Complaint, ¶¶ 24-31; Pl. Opp., at 1-4, 17-20.  Therefore, while it appears it would be appropriate for me to consider the settlement agreement, my decision today is not based on nor informed by any language in or provision of the settlement agreement and I need not address the issue.

& Son, Inc. v. Geapag A.G., 134 F.3d 1090, 1093 (Fed. Cir. 1998) ("The limited exception we have provided conferring standing on licensees is restricted to virtual assignees. As such, the licensing arrangement conferring such must, logically, resemble an assignment in both form and substance."); see also Waterman v. Mackenzie, 138 U.S. 252, 255 (1891).

Nearly a century ago, the U.S. Supreme Court held that, as a general rule, an exclusive licensee must join the patent owner if it seeks to enforce the owner's patent in court: "Any rights of the licensee must be enforced through or in the name of the owner of the patent…" Indep. Wireless Tel. Co. v. Radio Corp. of Am., 269 U.S. 459, 467-468 (1926); see also Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1377 (Fed. Cir. 2000) ("[T]his court continues to adhere to the principle set forth in Independent Wireless that a patentee should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee."). The Federal Circuit has recognized an exception to this rule: "where the patentee makes an assignment of all substantial rights under the patent, the assignee may be deemed the effective 'patentee' under 35 U.S.C. § 281 and thus may have standing to maintain an infringement suit in its own name." Prima Tek II, 222 F.3d at 1377 (citing Vaupel, 944 F.2d at 875); Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1253 (Fed. Cir. 2000) (finding a company had standing because the company was, by virtue of two written agreements between the company and the inventor, the "de facto" owner of those patents).

### i. A field-of-use licensee must join the patent owner

Whether Trendx has been granted substantial rights under the patent must be determined within the context of what rights Dysarz actually granted to Trendx. The parties agree that Dysarz did not grant Trendx a complete license to its patents; Dysarz's

8

license to Trendx was limited to nonmarine products. Compl., ¶ 23; Def. Brief, at 2; Pl. Opp., at 2. Dysarz specifically retained its rights for marine products. Section 1.01 of the license agreement between Dysarz and Trendx reads: "Subject to the terms of this License Agreement, LICENSOR [Dysarz] hereby grants to LICENSEE [Trendx] an exclusive license to develop, sell, manufacture and market said Devices that are not specifically of a marine nature." License Agreement, § 1.01, attached as Ex. B to Cunniff Declaration ("License Agmt"). The Third Whereas Clause reads, in part: "LICENSEE will not, however, use the Devices to manufacture, market, and sell a fishing pole holder, boat cleats and stand-offs or any other products that are specifically of a marine nature; LICENSOR retains these specific uses...." Id. at 1. In other words, Dysarz divided its rights to the patented articles based on the type of product each party would manufacture or sell.

Where a patentee parses its rights based on the "field of use," the Federal Circuit has held, relying on Supreme Court precedent, the patent owner must be joined because the licensee does not have substantial rights. In International Gamco, Inc. v. Multimedia Games, Inc., 504 F.3d 1273 (Fed. Cir. 2007), the plaintiff, who possessed an exclusive license only as to "the lawful operation of lottery games authorized by the New York State Lottery in the state of New York," id. at 1275-76, sued for infringement of a patent on a gaming system. The patent owner retained all other rights in the patent, including for non-lottery gaming systems. Id. The Federal Circuit held that this was a field-of-use license: a license where the patentee granted rights and retained rights based on subject matter. Id. at 1278. This was an issue of first impression for the court, which found guidance from an earlier Supreme Court opinion:

9

> While this court has not considered the ability of an exclusive field of use licensee to sue in its own name, the Supreme Court offered guidance in Pope Mfg. Co. v. Gormully & Jeffery Mfg. Co., 144 U.S. 248 (1892). The Supreme Court held that a plaintiff with exclusive rights limited to a particular embodiment of the claimed invention did not have standing to sue in his own name. Id. at 252. In Pope, the licensee received all substantial rights in the patent "so far as said patent relates to or covers the adjustable hammock seat or saddle." Id. at 249. Claim 2 of the patent covered the hammock seat while three other claims set forth combinations of which the hammock seat was only one element. Id. at 250. Thus, the plaintiff essentially received exclusive rights to only one claim of the patent.
>
> With this setting, the Court's reasoning focused on the potential for multiple litigations against any one defendant and among the licensees themselves:
>
>> It was obviously not the intention of the legislature to permit several monopolies to be made out of one, and divided among different persons within the same limits. Such a division would . . . subject a party who, under a mistake as to his rights, used the invention without authority, to be harassed by a multiplicity of suits instead of one, and to successive recoveries of damages by different persons holding different portions of the patent-right in the same place . . . . [I]t might lead to very great confusion to permit a patentee to split up his title within the same territory into as many different parts as there are claims.
>
> Id. at 250-52 (quotations omitted). Thus, the Court observed that even exclusive licenses to specific embodiments or claims of a patent engendered the threat of multiple suits for any given act of infringement.

Id. at 1277-78. Persuaded by the Supreme Court's reasoning, the Federal Circuit held:

"this court's prudential standing requirement compels an exclusive licensee with less

than all substantial rights, such as a field of use licensee, to join the patentee before

initiating suit." Id. at 1278-79.[3] The Federal Circuit made clear that its holding was not

---

[3] Judge Friedman filed a "*dubitante* opinion" doubting the court's holding, but not dissenting. In particular, Judge Friedman did not believe that the Supreme Court's holding in Pope mandated that a patent owner must be joined in all cases involving a field-of-use license. Judge Friedman reasoned as follows: "No one questions, as the Supreme Court recognized in Pope, that a territorially-limited exclusive license

limited only to licenses that parsed out rights depending on particular patent claims: "The claim-by-claim exclusive license in Pope is indistinguishable from an exclusive field of use license insofar as both types of licenses divide the scope of a patent right by its subject matter." Id. at 1278.

The Federal Circuit recently reaffirmed its holding: "Under long-standing prudential standing precedent, an exclusive licensee with less than all substantial rights in a patent, such as a field-of-use licensee, lacks standing to sue for infringement without joining the patent owner." A123 Sys. v. Hydro-Quebec, 626 F.3d 1213, 1217 (Fed. Cir. 2010). In A123, the patentee granted a license to its patents related to lithium battery technology for a particular type of rechargeable battery and to sell batteries in bulk quantities; the patentee retained the remaining rights. Id. at 1218. Therefore, the patentee was a necessary party to the lawsuit. Id. at 1219. Trendx states that these cases are factually distinguishable. Pl. Opp., at 11, n.5. But Trendx provides no analysis beyond this bald conclusion, other than two parenthetical comments discussing the patented technology at issue in International GamCo and A123 Sys. Many patent cases will involve significantly different technologies, but I am not convinced why this, by

---

authorizes the licensee to sue for infringement. The statute governing patent assignments, 35 U.S.C. § 261, however, contains parallel sentences that seem to treat geographical and field-of-use assignments the same...Under this language, it seems unlikely that Congress intended only the latter (geographical), but not the former ('any interest' in a patent) assignees to be able to sue in their own names." Int'l Gamco, 504 F.3d at 1280. Judge Friedman's point is well taken and I too question whether such a blanket rule is appropriate or necessary. Nevertheless, the Federal Circuit's holding is clear. See Eisai Co., Ltd. v. Mutual Pharmaceutical Co., Inc., No. 06-3613, 2007 U.S. Dist. LEXIS 93585, at *41 (D.N.J. Dec. 20, 2007) ("[D]ecisions of the Federal Circuit on substantive questions of patent law are binding precedent on district courts.") (quotation omitted). Moreover, the facts of this case offer no reason to depart from precedent because as I discuss, *infra*, Dysarz did not grant Plaintiff substantial rights to its patents.

itself, is any reason to depart from precedent that is on point with a relevant legal issue before me.

Trendx also argues it was not granted a field-of-use license, but that Dysarz's divvying up of its rights was "rather more akin to a geographic distinction." Pl. Opp., at 10. The Patent Act specifically allows for geographically-restricted assignments and the Supreme Court has held that exclusive territorial licensees need not join the licensor to maintain a suit for patent infringement. Waterman, 138 U.S. at 255. I am not persuaded by Trendx's argument. A geographic license is one where the parties divide up patent rights based on the location where those rights may be performed or enforced; for example, a licensor might retain the right to exclusively sell a patented product in New Jersey, while licensing the right to exclusively sell the product in New York. Plaintiff's argument would mean then that Dysarz retained a right to make, use, and sell patented products at sea, while it granted Plaintiff an exclusive license to make, use, and sell patented products on land. That plainly is not what the parties intended. Dysarz retained its patent rights as to marine products (which it could exercise anywhere) and granted Plaintiff a license to develop, sell, manufacture, and market non-marine products, which Plaintiff could exercise anywhere. Indeed, section 1.02 grants Trendx a worldwide scope to its licensed rights as Trendx itself recognizes. License Agmt, § 1.02; Pl. Opp., at 9 ("[Trendx's] exclusive license is without geographic restriction…"). This section would have no effect if I were to interpret this agreement as a geographic license. Further, the parties discuss their rights based on the type of product to be manufactured or sold, not where the right will be enforced. For example, the Third Whereas Clause reads, in part: "LICENSEE will not, however, use the Devices to manufacture, market, and sell a fishing pole holder, boat cleats and stand-offs that are specifically of a marine

12

nature." License Agmt, at 1. And later, it discusses the products that are "the subject of this agreement" and gives examples: torch holders, pole holders, and umbrella holders. Id. § 1.03.

Trendx also cites Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336 (Fed. Cir. 2006), in support of its argument that it does have substantial rights. This citation is somewhat baffling as it is a case holding that a licensee, who held even more rights than Trendx, did not have substantial rights. There the Federal Circuit held that even though the patent owner had licensed: "(1) the exclusive right to make, use, and sell products covered by the patent; (2) the right to sue for infringement of the patent; and (3) a virtually unrestricted authority to sublicense its rights under the agreement" it still had not transferred all substantial rights and therefore it could bring suit in its own name because the license term was only for a limited period of time. Id. at 1342. Instead of assigning its rights by time, Dysarz did so by subject matter, and thus it remained owner of its patents for the same reasons as were articulated in Aspex Eyewear. Id. at 1343. Trendx additionally cites to Ciba-Geigy Corp. v. Alza Corp. and Surgical Laser Technologies v. Laser Industries, to argue that Dysarz's limited retention of rights as to marine products does not undermine Trendx's unrestricted use of the patents. But in Ciba-Geigy, the patent owner retained rights only to the extent it triggered a contract clause subject to a condition subsequent, which it never did. Ciba-Geigy Corp. v. Alza Corp., 804 F. Supp. 614, 631 (D.N.J. 1992). And in Surgical Laser, the patent owner retained the rights only for a limited educational, non-commercial purpose. Surgical Laser Technologies v. Laser Industries, No. 91-3068, 1991 U.S. Dist. LEXIS 17191, at *7-9 (E.D. Pa Nov. 27, 1992). Neither factual situation applies here as Dysarz always maintained a significant commercial interest in its patents. Furthermore,

13

I find that the types of license agreements at issue in Int'l GamCo and A123 Sys are more factually apposite to the agreement between Dysarz and Trendx.

### ii. Trendx does not have substantial rights to the patents

Nevertheless, even if Trendx were correct and the license at issue is not a field-of-use license, Trendx still does not have all substantial rights to the patents and therefore cannot enforce the patents solely in its name. To determine whether a license agreement has conveyed all substantial rights in a patent, a court must ascertain the intention of the parties and examine the substance of what was granted. Prima Tek II, 222 F.3d at 1378. In making this assessment, it is necessary to determine both what rights were granted and what rights were retained. Id.

A patent is a sanctioned monopoly and the essence of a patentee's right is to exclude others from making, using, or selling what is claimed. Vaupel, 944 F.2d at 875. If the patent owner licenses this right of exclusion, *in full*, to another, then that party may sue without joining the owner. See Prima Tek II, 222 F.3d at 1379-80 ("In evaluating whether a particular license agreement transfers all substantial rights in a patent to the licensee, we pay particular attention to whether the agreement conveys in full the right to exclude others from making, using and selling the patented invention in the exclusive territory."); Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1552 (Fed. Cir. 1995) ("To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well."). Otherwise, the exclusive licensee must join the patent owner. Textile Productions, Inc. v. Mead Corp., 134 F.3d 1481, 1483-84 (Fed. Cir. 1998) ("Thus, although a patentee has standing to sue in its own name, an exclusive

14

licensee that does not have all substantial rights has standing to sue third parties only as a co-plaintiff with the patentee.").[4]

Notably absent from Trendx's rights, even in its purportedly exclusive sphere of nonmarine products, is the ability to exclude others from practicing the patent. Whether a patentee has conveyed an exclusive right to sue is "particularly dispositive" in determining if all substantial rights have been licensed to the patentee. Abbott Labs. v. Diamedix Corp., 47 F.3d 1128, 1132 (Fed. Cir. 1995) (analyzing case law and finding the question of whether the "exclusive right to sue for infringement" is "particularly dispositive" of whether a party had obtained substantial rights). The license does not explicitly grant Trendx an outright right to sue. Rather, it provides: "If there is any claimed or apparent infringement of the patented Devices by any third party, whether discovery of said claimed or apparent infringement is by LICENSEE or LICENSOR, both parties agree they shall notify the other in writing within 15 days of receiving such information at which time LICENSOR and LICENSEE agree to jointly discuss, assess and determine an agreeable coarse [*sic*] of action that complies with the spirit and intention of this License Agreement." License Agmt, § 5.03. Contrary to Plaintiff's argument, this language does not convey an exclusive right to sue. All it requires is that

---

[4] There is an exception to this, recognized long ago, that grants an exclusive licensee the right to sue the patentee without joining the patentee as a plaintiff: "In equity, as at law, when the transfer amounts to a license only, the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself." Waterman, 138 U.S. at 255 (1891). Plaintiff cites two District of New Jersey opinions that stand for this proposition and argue that because it has the power to sue Dysarz it has substantial rights. Pl. Opp., at 7 (citing Novartis Pharms Corp. v. Teva Pharms. USA, Inc., No. 05-1887, 2009 WL 3447232 (D.N.J. Oct. 4, 2009); Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc., 565 F. Supp. 931 (D.N.J. 1983)). But of course Trendx is not trying to sue Dysarz. If it were, a different result might be warranted. And that result would have no bearing on whether Trendx has the exclusive right to sue third parties.

the parties discuss any possible or pending infringement actions.  Dysarz retains its right to sue unless the agreement provides otherwise.  See Textile Prod., 134 F.3d at 1485 (finding that patentee retained right to license to third parties when agreement was silent on the subject).

      Moreover, I must consider not only whether Trendx had the power to sue, but also whether the agreement "divests the licensor of that same right."  See Delano Farms Co. v. Cal. Table Grape Comm'n, 655 F.3d 1337, 1342 (Fed. Cir. 2011).  Even if Dysarz envisioned Trendx being able to initiate a lawsuit, the agreement does not preclude Dysarz from doing the same.  See IpVenture, Inc. v. ProStar Computer, Inc., 503 F.3d 1324, 1325 (Fed. Cir. 2007) ("Thus all entities with an independent right to enforce the patent are indispensable or necessary parties to an infringement suit.").  Dysarz's independent power to bring suit is evidenced by its lawsuit against Rio Brands in 2008.  Even in the face of Dysarz's independent enforcement actions, Trendx does not allege or argue that Dysarz breached its license agreement.  In fact, Trendx points to Dysarz's statements that the license agreement was "still in full force" even in light of Dysarz's lawsuit.  Compl., ¶ 31.  Thus, Dysarz's continuing right to enforce its patents accords with Dysarz and Trendx's agreement.

      Trendx also argues that because it had an exclusive right to sublicense the patents-in-suit, it could nullify any attempt by Dysarz to sue an alleged infringer by sublicening that party, thereby rendering any retained right-to-sue by Dysarz illusory.  Trendx relies on the Federal Circuit's language in Speedplay, Inc. for support.  There the court said that the patentees' "right to sue an infringer if Speedplay does not is illusory, because Speedplay can render that right nugatory by granting the alleged infringer a royalty-free sublicense."  Speedplay, Inc., 211 F.3d at 1251.  But the court's discussion

was in the context of a license agreement that explicitly granted Speedplay the *sole right* to enforce the patents.  Id.  And the patentees' retained right to sue was triggered if Speedplay failed to take action for three months; only then could the patentees sue in their own name.  Id.  Here Trendx does not have the sole right to enforce the patents and the license agreement appears to forestall any situation where Trendx could render Dysarz's right illusory because it requires the parties to discuss any infringement action beforehand.  See License Agmt, § 5.03.  Nor am I convinced that Trendx actually has an exclusive unfettered right to sublicense the patents, as did Speedplay.  The Trendx agreement only provides: "Whereas LICENSEE may desire to sublicense others…to maximize the patents potential and/or compliment [sic] its existing product line that are not specifically of a marine nature, LICENSEE agrees to supply LICENSOR with a letter that states the material elements of any executed agreement with a SUBLICENSEE…" License Agmt, § 1.03.  And in the subsequent section, the parties agree that Dysarz will not contact any party that Trendx is in negotiations with as this is best to "obtain the best prices and highest royalties."  Id. § 1.04.  This suggests that Dysarz was free to enter into negotiations with any company not negotiating with Trendx and also that it retained a right to sublicense its patents.  This language also suggests that the parties were not contemplating royalty-free sublicenses, another significant distinction from the facts presented in Speedplay, Inc.  Similarly, Trendx relies on Ciba-Geigy Corp., but there too, the court found the licensor had granted the licensee "the sole right" to enforce the patent at issue.  Ciba-Geigy Corp., 804 F. Supp. at 631 ("[T]his agreement granted the licensee the *sole right* to sue for past present and future infringement.") (emphasis added).  Such a clear granting of an exclusive right is lacking in Trendx's agreement with Dysarz.

17

Nor does the fact Dysarz and Trendx labeled their agreement as an "exclusive license" actually give Trendx exclusive rights to the patent. "Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." Waterman, 138 U.S. at 256; Vaupel, 944 F.2d at 875 ("[T]he use of the term 'exclusive license' in the [transfer agreements] is not dispositive; what the documents in fact recite is dispositive."). Here the legal effect of the license was not to give Trendx an exclusive right to exclude others from making, using, or selling the patented technology. Rather, it was a grant from Dysarz to Trendx of the right to develop, sell, manufacture, and market the patented technology as related to nonmarine products only, at most a shared right to enforce the patents with Dysarz, and a circumscribed right to sublicense. These rights cannot be said to be substantial and do not transform Trendx into either a virtual assignee or the de facto owner of the patents-in-suit. Therefore, Dysarz must be joined as a party if Trendx is to maintain its claim of patent infringement.

### b. Dismissal of Trendx's Patent Claims

Trendx argues that if I find that Dysarz is a necessary party, then Trendx should be granted leave to amend rather than having Count I dismissed. Pl. Opp., at 15. Rio Brands disagrees. Def. Reply, at 7. Other courts that have addressed this issue have found themselves compelled to dismiss the claims because the Federal Circuit has said that it is necessary to join the patentee before initiating the lawsuit:

> Significantly, in Int'l Gamco, the federal circuit reversed the district court's denial of the defendant's motion to dismiss. It held that the motion to dismiss should be granted since the plaintiff, a holder of only an exclusive, field of use license with a geographical limitation, lacked standing to sue on its own. Rather, joinder of the patent owner prior to institution of the action was mandated.

18

Road Sci., L.L.C. v. Cont'l Western Transp. Co., No. 09-2023, 2009 U.S. Dist. LEXIS 122262, at *13-14 (E.D. Cal. Dec. 14, 2009); see also Univ. of Pittsburgh v. Varian Med. Sys., No. 07-0491, 2008 U.S. Dist. LEXIS 36098, at *7-8 (W.D. Pa. Apr. 30, 2008) (analyzing the same language and dismissing Plaintiff's action because it did not join a necessary party before initiating its action), vacated on other grounds by 569 F.3d 1328, 1334 (Fed. Cir. 2009).[5] I need not decide whether or not International Gamco demands that I dismiss or not. It is within my discretion to either dismiss or allow an amendment to substitute parties. Ricci v. State Bd. of Law Examiners, 569 F.2d 782, 784 (3d Cir. 1978). Nevertheless, "when a complaint is vulnerable to dismissal on the pleadings, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." Andela v. Am. Ass'n for Cancer Research, 389 Fed. Appx. 137 (3d Cir. 2010), citing Phillips v. Cty. of Allegheny, 515 F.3d 224, 236 (3d Cir. 2008). Therefore, Count I of Plaintiff's Complaint is DISMISSED WITHOUT PREJUDICE; Trendx may cure its lack of standing by making a motion to amend to add Dysarz as a party.[6]

---

[5] The Federal Circuit vacated the district court's decision because its dismissal was with prejudice, but it left undisturbed the determination that dismissal was appropriate for failure to join the patent holder.

[6] Because I am dismissing Trendx's patent claim, I need not decide what effect, if any, Dysarz's settlement agreement with Rio Brands has on Trendx's ability to sue on the Settled Patents. Nevertheless, I briefly comment on this issue to provide some guidance to the parties should Trendx choose to refile its patent claim. I am skeptical that Trendx would be allowed to maintain an action against Rio Brands on patents for which Rio Brands has already litigated and paid money in settlement to Dysarz. The paramount concern underlying the Supreme Court's holding in Independent Wireless was to alleviate the threat of an alleged infringer being subjected to duplicative lawsuits: "The presence of the owner of the patent as a party is indispensable not only to give jurisdiction under the patent laws but also, in most cases, to enable the alleged infringer to respond in one action to all claims of infringement for his act, *and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all*

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. An order will be entered consistent with this Opinion.

Dated: April 18, 2012                              /s/    Freda L. Wolfson
                                                   Honorable Freda L. Wolfson
                                                   United States District Judge

---

*subsequent actions.*" Independent Wireless, 269 U.S. at 468 (emphasis added). Plaintiff argues that such a concern is illusory here because Dysarz's rights have already been adjudicated and therefore Dysarz will not again sue Rio Brands. But it is not the specter of a hypothetical, future lawsuit by Dysarz that is cause for concern – it is Trendx's current action that makes the threat of duplicative litigation manifest. To allow Trendx the opportunity to relitigate the same patents seems to run afoul of the Supreme Court's and the Federal Circuit's prudential standing concerns.

Moreover, beyond these equitable concerns, Rio Brands appears to have an after-acquired license to the '016 patent. The Patent Act states: "An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage." 35 U.S.C. § 261; Heidelberg Harris, Inc. v. Loebach, 145 F.3d 1454, 1456 (Fed. Cir. 1998) ("[The defendant was] a bona fide purchaser of a license under the asserted patent and therefore is not subject to suit for infringement of the patent."). And while Dysarz did not license the two other Settled Patents, (the'234 patent and the '163 patent) – instead covenanting not to sue Rio Brands on those patents – some courts have found privity between a patent holder and a licensee when the patent holder has already sued on licensed patents, thereby binding the licensee to the patent holder's lawsuit. Erbamont, Inc. v. Cetus Corp., 720 F. Supp. 387, 394-395 (D. Del. 1989) ("There is a strong possibility that both the Erbamont-Farmitalia and Erbamont-Erbamont N.V. relationships fall within this definition because both Farmitalia, by its license agreement, and Erbamont N.V., by its representations to defendants, claim a concurrent interest in the '124 patent."); Arcade, Inc. v. 3M, No. 96-0359, 1997 U.S. Dist. LEXIS 21687, at *22 (E.D. Tenn. June 10, 1997) ("BBCo is in privity with Arcade by virtue of their exclusive licensing agreement."); see also Gardiner v. Virgin Islands Water & Power Authority, 145 F.3d 635, 642 (3d Cir. 1998) ("[P]arties in privity are bound by rulings made in their absence"). In other words, Trendx might be considered a virtual party should Rio Brands raise an issue of res judicata. But as Trendx correctly notes, the settlement between Dysarz and Rio Brands did not involve the '191 patent, so these concerns would have no bearing should Trendx join Dysarz and bring an action for infringement based on that patent alone.